RAFAEL A. GÓMEZ PAGÁN Y OLGA IRIS TIRADO VELÁZQUEZ
Recurridos-Apelantes-Apelados

v.

JANSSEN ORTHO-LLC
Peticionario-Apelado-Apelante

CÁNDIDO GONZÁLEZ, FULANA DE TAL Y LA SOCIEDAD LEGAL
DE GANANCIALES COMPUESTA POR ESTOS; SUTANO Y MENGANO

Núms. Cons. KLCE-2002-00952 / KLAN-2002-01070 / KLAN-2002-01072

San Juan, Puerto Rico, a 20 de mayo de 2004

Panel integrado por su Presidente, el Juez Colón Birriel,
y los Jueces Escribano Medina y Salas Soler

Colón Birriel, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

### I

El 12 de septiembre de 2002, Janssen Ortho-LLC ("*Janssen*") presentó una petición de *certiorari* (KLCE-2002-00952) solicitando la revocación parcial de la **Resolución** emitida el 12 de agosto de 2002, notificada el 13 de agosto, por el Tribunal de Primera Instancia, Sala Superior de Caguas, (el "*TPI*") en el caso *Rafael A. Gómez Pagán v. Janssen Ortho-LLC*, Civil Núm. EAC2000-0013 (402); sobre: discrimen y daños. En ésta se aprobó una partida de gastos por nueve mil treinta y dos dólares ($9,032) de los cuales ocho mil ochocientos cincuenta dólares ($8,850) corresponden a honorarios periciales. El TPI indicó que concedía los honorarios periciales como costas por entender que "*[p]ara que el demandante prevaleciese demostrando su inhabilidad laboral y la razón de su renuncia al puesto, el testimonio del Dr. Jaime Del Toro fue esencial*".

Por otro lado, el 14 de octubre de 2002, Rafael A. Gómez Pagán ("*Gómez Pagán*") y su esposa Olga Iris Tirado presentaron un *Escrito de Apelación* (KLAN-2002-01070) solicitando la revisión y aumento de la cuantía fijada en concepto de compensación por los daños físicos, morales y las angustias sufridas por Gómez Pagán en la **Sentencia Enmendada en Reconsideración** dictada el 9 de septiembre de 2002, archivada en los autos copia de su notificación el 12 de septiembre.

A su vez, en esa misma fecha 14 de octubre de 2002, Janssen presentó una *Apelación* (KLAN-2002-01072) solicitando la revocación de la **Sentencia Enmendada en Reconsideración** a la que hicimos referencia anteriormente. En unión a su recurso presentó una *Moción en Solicitud de Consolidación y en Cumplimiento de Resolución*. En **Resolución** de 15 de noviembre de 2002 ordenamos la consolidación de los recursos KLAN-2002-01070 y KLAN-2002-01072 con el KLCE-2002-00952.

En la **Sentencia Enmendada en Reconsideración,** en su parte dispositiva, paginas 10 y 11 el TPI, concluyó como sigue:

"*Aquí existió un perjuicio evidente. Si se considera que hubo un curso de discrimen hacia el demandante.*

277

*Que éste se vio afectado sustancialmente en su vida resulta razonable una compensación por daños patrimoniales de $232,436.40 en salarios dejados de devengar a partir de que se vio forzado a dejar el empleo y hasta la edad de 62 años cuando pensaba jubilarse. Asimismo, los daños morales y en su persona se valoran en $40,000 más la doble penalidad estatutaria.*

*En lo que respecta a la codemandante, ésta no demostró una causa de acción independiente. Aunque dijo haber requerido tratamiento médico, no expresó con datos concretos ese extremo. Tampoco lo del abandono del empleo, pues lo hizo dos años después del retiro del esposo y cuando él se hallaba estabilizado.*

*Tratándose de una reclamación bajo la Ley Núm. 100, supra, los honorarios de abogado son el 25% de la cantidad básica concedida a Rafael A. Gómez. López Vicil v. ITT Intermedia, Inc., 143 D.P.R. 574.*

*En virtud de los fundamentos consignados, se desestima la demanda en cuanto a Olga I. Tirado. Se declara CON LUGAR en cuanto a Rafael A. Gómez Pagán y se condena a la parte demandada al pago de $232,436.40 en concepto de indemnización por el discrimen del cual fue víctima en su empleo debido a su edad. Asimismo, la doble penalidad por la pérdida de ingresos pasados y futuros. Además, $40,000 por los daños físicos, morales y las angustias sufridas. Aplica también la doble penalidad a esta partida.*

*Los honorarios de abogado se compensan con un 25% de la cantidad básica y son responsabilidad del patrono cuyo personal gerencial discriminó al obrero causándole daños a su salud física y emocional.”*

Resolvemos con el beneficio de la comparecencia de las partes, la voluminosa transcripción del juicio en su fondo y los autos originales, no sin antes exponer, en lo pertinente, el trasfondo fáctico de lo acaecido.

## II

Gómez Pagán comenzó a trabajar como mecánico industrial de Janssen el 10 de marzo de 1989. En el 1996, alegadamente se desató contra su persona un patrón de discrimen por razón de su edad. El alegado discrimen se manifestó de diferentes maneras, entre éstas, mediante una serie de evaluaciones negativas en el desempeño de su labor. La alegada humillación a la que fue sometido lo llevó a perder el control de sus emociones, llorando constantemente; una vez frente al personal del departamento de recursos humanos de Janssen.

Como consecuencia de lo anterior, el 19 de enero de 2000, Gómez Pagán y su esposa presentaron demanda contra Janssen, su supervisor Cándido González, ██ Fulana de Tal y la Sociedad Legal de Gananciales compuesta por éstos, al amparo de los artículos 1802 y 1803 del Código Civil, 31 L.P.R.A. § 5141 y 5142; el *“Age Discrimination Employment Act of 1967”*, 29 U.S.C. § 621; de las disposiciones del Artículo II de la Carta de Derechos de la Constitución del Estado Libre Asociado de Puerto Rico; y, de la Ley Núm. 100 de 30 de junio de 1959, según enmendada, 29 L.P.R.A. § 146-151. Entre otras reclamaciones, solicitaron los daños y perjuicios alegadamente sufridos por ambos. El 1ro. de febrero de 2000, Janssen presentó su contestación a la demanda. Entre sus defensas afirmativas adujo que nunca discriminó contra Gómez Pagán por razón de su edad ni en forma alguna, como tampoco incurrió en persecución y hostigamiento en su contra y que el desempeño de éste siempre había sido evaluado objetivamente y de conformidad con las normas y políticas aplicables.

Luego de comenzado el descubrimiento de prueba, el 15 de agosto de 2000, Janssen presentó una *Moción en Relación a Honorarios Periciales y en Solicitud de Orden Protectora*. El 13 de septiembre de 2000, notificada el 15 de septiembre, el TPI emitió una orden protectora fijando los honorarios periciales del Dr. Jaime Del Toro, perito de Gómez Pagán, a razón de trescientos dólares ($300) por hora por su comparecencia a una deposición. Además, dispuso que no se incluia el período de estudio o preparación en el cómputo, así como tampoco el tiempo posterior a la declaración.

Posteriormente, el 30 de marzo de 2001, las partes presentaron el *Informe Preliminar sobre Conferencia*

*Preliminar entre Abogados.* El 6 de abril de 2001, se celebró la Conferencia con Antelación al Juicio.

Luego de concluir con el descubrimiento de prueba, el TPI señaló la celebración del juicio en su fondo. El juicio se celebró durante los días 20 y 21 de mayo y 20 y 25 de junio de 2002. Testificaron, por parte de Gómez Pagán, además de éste: 1) Faustino Aponte Laboy, su compañero de trabajo de cincuenta (50) años de edad; 2) Carlos Burgos Rodríguez, otro compañero de trabajo de cincuenta y un (51) años de edad; y 3) el Dr. Jaime Del Toro, su psiquiatra y perito en el caso. Testificaron por parte de Janssen: 1) Laura Virginia Rodríguez Delgado, directora ejecutiva de efectividad organizacional para Johnson & Johnson, quien trabajó en Janssen en el área de adiestramiento; 2) Rosie Luján Nieves, *"employee relations expert"* en Janssen; 3) Luis Guillermo Pérez Molina, director de manufactura y luego gerente de ingeniería y mantenimiento en Janssen; 4) Russell Joseph Casserino, *"engineering systems facilitator"* en Janssen; 5) Cándido González Martínez, supervisor de mantenimiento hasta diciembre de 2000 y luego ingeniero de empaque final en Janssen; y 6) Fernandito Arroyo Ramírez, quien ha ocupado varios puestos en Janssen, tales como mecánico de línea, *"group leader"*, *"packaging engineering specialist"* y *"packaging engineering facilitator"*.

Concluido el juicio, el 9 de julio de 2002, notificada el 19 de julio, el TPI dictó **Sentencia** desestimando la reclamación instada por la co-demandante Olga Iris Tirado; declaró con lugar la demanda de Gómez Pagán y condenó a Janssen al pago de doscientos mil dólares ($200,000) en concepto de indemnización por el discrimen del cual fue víctima Gómez Pagán en su empleo por razón a su edad, más la doble penalidad impuesta por ley. Además, impuso honorarios de abogados en un veinticinco por ciento (25%) de la cantidad básica y por la responsabilidad de Janssen cuyo personal gerencial discriminó a Gómez Pagán causándole daños a su salud física y emocional.

El 29 de julio de 2002, Gómez Pagán presentó escrito titulado **Moción Solicitando Determinaciones de Hechos** con relación a las causas de acción por concepto de lucro cesante y la de daños y perjuicios instada por Olga Iris Tirado. Además, ese mismo día presentó un memorando de costas al amparo de la Regla 44 de las de Procedimiento Civil, 32 L.P.R.A. Ap. III. El 30 de julio de 2002, notificada el 1ro. de agosto, el TPI emitió **Resolución** declarando **No Ha Lugar** la solicitud de determinaciones de hechos adicionales solicitada por Gómez Pagán.

El 30 de julio de 2002, Gómez Pagán solicitó reconsideración a la sentencia dictada el 19 de julio de 2002, mediante la cual se desestimó su reclamación por concepto de lucro cesante o ingreso dejado de percibir. Además, en cuanto a la desestimación de la causa de acción instada por Olga Iris Tirado.

Por su parte, el 5 de agosto de 2002, Janssen presentó escrito titulado *Oposición de Memorando de Costas al Amparo de la Regla 44 de las de Procedimiento Civil.* Por otro lado, el 9 de agosto de 2002, Janssen presentó una *Oposición de Moción en Solicitud de Reconsideración.* En esa misma fecha, 9 de agosto del 2000, notificada el 13 de agosto, el TPI emitió una **Orden** con relación a la **Moción de Reconsideración** presentada por Gómez Pagán el 30 de julio de 2002, mediante la cual acogió dicha reconsideración. Por otro lado, ordenó a la parte demandada Janssen expresar en diez (10) días *"el porqué no enmendar la sentencia para incluir $232,436.40 en lugar de los $160,000 que concedió como daños por pérdida de ingresos"*.

Mediante escrito del 10 de agosto de 2002, de Gómez Pagán, titulado **Réplica Oposición a Memorando de Costas**, éste se allanó a que se eliminara de su memorando de costas, los gastos de correspondencia y fotocopias como costas del litigio. No obstante, se reafirmó en su derecho a que se le reembolsaran como costas los gastos del perito Dr. Jaime Del Toro. Mediante **Resolución** emitida el 12 de agosto de 2002, notificada el 13 de agosto, el TPI aprobó costas ascendentes a $9,032, de los cuales $8,859 correspondían a honorarios periciales. Por otro lado, el 15 de agosto de 2002, Janssen, en escrito titulado **Moción en Solicitud de Aclaración de Orden**, solicitó al TPI le aclarare de donde surgía la suma de $160,000 incluida en su **Orden** del 9 de agosto, notificada el 13 de agosto y porqué concepto había concedido los $200,000.

El 23 de agosto de 2002, Janssen presentó una *Moción en Cumplimiento de Orden* de la orden emitida por el TPI el 9 de agosto de 2002. Solicitó se diera por cumplida lo ordenado el 9 de agosto y se declarare **No Ha Lugar** la solicitud de reconsideración presentada por Gómez Pagán el 30 de julio de 2002 En esa misma fecha, 23 de agosto, Janssen presentó una *Moción en Solicitud de Reconsideración Parcial*, en la que solicitó del TPI que reconsiderara parcialmente la **Resolución** emitida el 12 de agosto de 2002, y en su consecuencia declarara sin lugar la solicitud de Gómez Pagán en cuanto a las costas reclamadas por concepto de gastos de peritaje. Luego de transcurrido el término de diez (10) días de la presentación de la solicitud, se entendió rechazada de plano según las disposiciones de la Regla 47 de las de Procedimiento Civil, 32 L.P.R.A. Ap. III.

Por otro lado, el 9 de septiembre de 2002, notificada el 10 de septiembre, el TPI dictó **Resolución en Reconsideración** y la **Sentencia Enmendada en Reconsideración** mencionada anteriormente. A continuación transcribimos las determinaciones de hechos incluidas en la referida sentencia:

### DETERMINACIONES DE HECHOS

1. Rafael A. Gómez Pagán nació en octubre 21 de 1945. Luego de varios años de experiencia en mecánica, comenzó a trabajar en Janssen, Inc. el 10 de abril de 1989. Venía de Squibb Mfg., Inc. donde había desempeñado tareas similares. Se trata de una persona religiosa con una maestría en teología.

2. Janssen Puerto Rico evalúa, periódicamente, a sus empleados. Del resultado de las evaluaciones depende el incremento salarial del personal. A partir de diciembre de 1989, las evaluaciones a Rafael A. Gómez revelan que no necesita mucha supervisión, es cooperador con sus compañeros. Gómez se interesaba por ayudar y aprender nuevos sistemas. Entre 1989 y 1995, sus evaluaciones fueron excelentes. Para ese entonces estaba prestando servicios en el primer turno. A ese llegaba por antigüedad en la empresa.

3. Para fines de 1995, la empresa querellada sufrió una reestructuración. Bajo ésta se enfatizó en la productividad, eficiencia y la disminución de costos. La filosofía fue expuesta en el tablero de edictos de la planta en un artículo donde se reseñaba que las personas productivas eran los jóvenes. Que a mayor edad, menor rendimiento. El artículo se puso con el fin de que todos lo viesen. Según la gráfica, las personas con mas de cincuenta años de edad no son productivas como empleados.

4. Bajo el nuevo sistema de producción, para el 4 de noviembre de 1995, Rafael A. Gómez recibió 4.4 de un total de 10. Se le decía que debía actuar con más seguridad y tomar riesgos.

5. Los nuevos estilos de la empresa se acentuaron cuando se colocó como supervisor de los mecánicos a Cándido González. A los 31 años de edad supervisaba de dieciocho a veinte mecánicos de Janssen. Los comentarios de González a sus supervisados, mayores que él, eran de que eran obsoletos, no estaban al día, eran viejos. Sus comentarios hirientes no era lo único que hizo con relación a la edad. González comenzó a favorecer a los mecánicos jóvenes asignándoles seminarios para capacitarlos y mejores evaluaciones. Al ser inquirido sobre el particular, decía que las evaluaciones más bajas eran para equiparar el sueldo de los más viejos a los jóvenes. Uniendo la palabra a la acción, se evaluaba a los más viejos con menor puntuación.

6. La conducta de favorecer a los jóvenes *"nenes de Cándido"*, le llevó a colocar de sublíder a Fernandito Arroyo, un joven de veintitantos años, en el primer turno. La primera evaluación que le hizo a Rafael A. Gómez, la hizo de 2.72 de un total de 10. Fue la primera vez que se determinaba por un supervisor de que Gómez no cumplía con las expectativas de la empresa. A Carlos Burgos, empleado de más de cincuenta años, también le hizo una evaluación de 3.15 que no cumplía con lo esperado. Faustino Aponte fue descendido eventualmente del puesto de mecánico. Su edad era similar a la los de los otros dos citados y las evaluaciones bajas también.

Ahora Gómez era conflictivo, resistente al cambio y necesitaba mejorar su técnica. Todo esto según su

supervisor Cándido González. Para la evaluación de 1998, el señor Gómez anotó que la evaluación era motivada por el discrimen. Pedía que se discutiera en otro foro más objetivo. Janssen no atendió el reclamo. En la de 1999, Rafael A. Gómez volvió a señalar persecución del supervisor cuando recibió 2.5 de promedio. No la firmó y se marchó llorando del lugar adonde se le llamó para discutir la evaluación.

7. El 15 de agosto de 1999, Cándido González le preparó un Plan de Desarrollo a Gómez. Estos se hacen con los empleados que queden por debajo de las expectativas de la compañía. Como punto final el empleado tenía que firmar lo siguiente:

*"Entiendo que los puntos traídos anteriormente no son discriminatorios ni de hostigamiento contra mi persona Están relacionados con mi ejecutoria de trabajo y mi necesidad de mejorarlos"*

Rafael Gómez rehusó firmar. No obstante, estaba de acuerdo con recibir adiestramiento. Es necesario apuntar que en estos últimos la predilección de González era dar mejores oportunidades a los jóvenes mecánicos. Que a los mayores se les daban, generalmente, aquellos compulsorios a tenor con las reglamentaciones de la industria. A los mayores no se les entrenaba en los equipos y líneas nuevas.

8. La conducta del supervisor de los mecánicos del primer turno motivó reuniones de éstos con la gerencia. Con los mecánicos del segundo turno, el trato era considerado, se aceptaban sus ideas, era amable. En cambio, con los del primero era autoritario, se desmerecía la labor y no se aceptaba el trabajo. La antigüedad la tenían los del primero y más edad. Esto y los problemas salariales concomitantes hicieron necesaria la reunión. En ésta participó un joven de nombre John Figueroa quien era extrovertido, ofrecía sus opiniones. También tuvo problemas con la compañía e incluso tenía una reclamación judicial contra ésta. Como resultado de la reunión con la directora de personal, ésta llamó a Cándido González para que mejorase su estilo con relación a los supervisados.

9. Rafael A. Gómez llevó a la atención de los directivos de personal el hostigamiento por edad que tenía González contra él. Nunca se hizo un informe sobre el planteamiento del empleado. Aparte de recordarle a González que la política de la empresa era la de no-discrimen, no se hizo más. Con ello se despacho la queja de Gómez sin ulterior gestión y ni siquiera informarle el resultado de la investigación que él había pedido.

10. Rafael A. Gómez tenía a su cargo la reparación y mantenimiento de las líneas más antiguas de la compañía. Las máquinas, en consecuencia, eran más propensas a romperse. Desde que llegó Cándido González, las piezas tardaban más en llegar a manos del mecánico. La presión del supervisor aumentaba en cuanto al trabajo de Gómez. Las acciones de González comenzaron a afectar la salud de Gómez. Además, de los comentarios acerca de la edad y la obsolescencia de Rafael A. Gómez sobre éste se cernía el desempleo, puesto que un Plan de Desarrollo no cumplido a juicio del supervisor podía acarrear el despido. Gómez apenas podía dormir a causa de las preocupaciones en el trabajo. El trato arrogante y de menosprecio por el esfuerzo en mantener funcionando las máquinas dejó huellas en la salud del supervisado en su mente y físico. Empezó a tener presión arterial de sobre 150/90. La queja sobre el trato discriminatorio se tradujo en un empeoramiento del supervisor hacia él. Rafael Gómez temía tener que acudir al trabajo cada día. De noche se encerraba en sí mismo, pensando sobre su situación. No podía renunciar al trabajo por los compromisos económicos. Pero finalmente, tuvo que dejar el trabajo donde recibía $14.07 la hora por un seguro social de $1,114.00 al mes. A los cincuenta y cuatro años debió retirarse por su incapacidad laboral. Su esposa tiene que dedicarse a llevarlo a las citas médicas, ya que toma medicamentos recetados por los médicos que le atienden para sus padecimientos mentales, neurológicos y cardiovasculares. Ella dejó su empleo dos años después que su esposo para cuidarle.

11. Desde 1996, Rafael A. Gómez se deprimió emocionalmente. Las tensiones laborales, además, le llevaron a desarrollar una enfermedad hipertensiva no controlada con medicamentos. La depresión y la ansiedad se fueron desarrollando gradualmente. Pero la hipertensión le causó un derrame cerebral el 3 de diciembre de 1998. Al regreso al trabajo, luego de la recuperación, recibió peor trato del supervisor. A raíz del proceso evaluativo de

1999 sufrió un segundo infarto cerebral en noviembre de 1999. Tuvo que buscar ayuda psiquiátrica en noviembre de 1999. El psiquiatra que lo atendió creyó detectar la enfermedad de *"Parkinson"* en el señor Gómez. Las pruebas clínicas corroboraron la impresión diagnóstica inicial. Después de que dejó el empleo, la condición emocional mejoró un tanto hasta que en una deposición en este pleito se le agravó a consecuencia del trato recibido, a juicio del psiquiatra.

12. Para el Dr. Jaime Del Toro, la tensión emocional llevó a la hipertensión, ésta a los infartos cerebrales y las lesiones que dejaron le causaron el mal de *"Parkinson"*. La presión diastólica de 130 o más le llevó a la lesión cerebral en dos puntos de la sustancia blanca. Con la muerte de las neuronas y la alteración a los circuitos, se le causó daño al hipotálamo y a la sustancia nigra. De ahí, el *"Parkinson"* que desarrolló el querellante.

13. Después de lo ocurrido con Rafael A. Gómez, el trato de Cándido González hacia los empleados mayores de edad cambió. El supervisor pidió excusas a Carlos Burgos, uno de los afectados, y en general, mostró más consideración hacia estos grupos.

14. El señor Rafael A. Gómez trabajaba regularmente cuarenta horas a la semana. El salario anual era de $29,266.00 en su posición con la empresa demandada.

15. Rafael A. Gómez pudo haberse jubilado con plenos beneficios a los 62 años de Janssen Ortho-LLC. No pudo lograr su propósito debido a las enfermedades que le causó la conducta de la parte demandada.

Inconforme, en diferentes aspectos tanto con la **Resolución** imponiendo costas como de la **Sentencia Enmendada en Reconsideración** Janssen (KLCE-02-00952 y KLAN-02-1072); y Gómez Pagán (KLAN-02-01070), acuden ante este foro mediante los tres recursos mencionados y alegan que:

**KLCE-2002-00952 (Janssen):**

1. Erró el TPI al determinar que procedía la imposición de costas por concepto de peritaje, sin haber sido dicha partida plenamente justificada por la parte demandante.

2. Erró el TPI al conceder una partida excesiva de costas por concepto de peritaje.

**KLAN-2002-01070 (Gómez Pagán):**

1. Incidió el TPI al valorizar los daños físicos, morales y las angustias mentales sufridas por el demandante Rafael A. Gómez Pagán en la suma de cuarenta mil dólares ($40,000). Dicha suma es tan irrazonablemente baja que justifica la intervención del tribunal para aumentarla.

**KLAN-2002-01072 (Janssen):**

1. El TPI erró al realizar un uso inadecuado de un proyecto de sentencia.

2. El TPI incurrió en error manifiesto en la apreciación de la prueba al concluir que a partir de diciembre de 1989, las evaluaciones a Rafael A. Gómez revelan que no necesitaba mucha supervisión, es cooperador con sus compañeros. Gómez se interesaba por ayudar y aprender nuevos sistemas. Entre 1989 y 1995, sus evaluaciones fueron excelentes.

3. El TPI incurrió en error manifiesto en la apreciación de la prueba al concluir que la filosofía de Janssen fue expuesta en el tablero de edictos de la planta en un artículo donde se reseñaba que las personas productivas eran las jóvenes, que a mayor edad, menos rendimiento, que el artículo se puso con el fin de que todos lo viesen, y que

según la gráfica, las personas con más de cincuenta años de edad no son productivas como empleados.

4. El TPI incurrió en error manifiesto en la apreciación de la prueba al concluir que los comentarios de Cándido González a sus supervisados, mayores que él, se dirigían a que eran obsoletos, no estaban al día y eran viejos.

5. El TPI incurrió en error manifiesto en la apreciación de la prueba al concluir que Cándido González comenzó a favorecer a los mecánicos jóvenes asignándoles seminarios para capacitarlos y mejores evaluaciones, mientras que a los mayores no se les entrenaba en los equipos y las líneas nuevas.

6. El TPI incurrió en error manifiesto en la apreciación de la prueba al concluir que Cándido González evaluaba a los empleados más viejos con menor puntuación.

7. El TPI incurrió en error manifiesto en la apreciación de la prueba al concluir que la conducta de favorecer a los jóvenes *"Nenes de Cándido"*, le llevó a colocar en calidad de sub-líder a Fernandito Arroyo, un joven de veintitantos años de edad.

8. El TPI incurrió en error manifiesto en la apreciación de la prueba al concluir que a Carlos Burgos, empleado de más de cincuenta años, Cándido González también le hizo una evaluación de 3.15 que no cumplía con lo esperado.

9. El TPI incurrió en error manifiesto en la apreciación de la prueba al concluir que Faustino Aponte fue descendido eventualmente del puesto de mecánico.

10. El TPI incurrió en error manifiesto en la apreciación de la prueba al concluir que aparte de recordarle a Cándido González que la política de la empresa era de no discriminar, no se hizo más.

11. El TPI incurrió en error manifiesto en la apreciación de la prueba al concluir que con los mecánicos del segundo turno el trato de Cándido González era considerado, se aceptaban sus ideas, era amable.

12. El TPI incurrió en error manifiesto en la apreciación de la prueba al concluir que para el Dr. Jaime del Toro la tensión emocional llevó a la hipertensión, ésta a los infartos cerebrales y las lesiones que dejaron le causaron el mal de *"Parkinson"*.

13. El TPI incurrió en error manifiesto en la apreciación de la prueba al concluir que después de dejar el empleo, la condición emocional mejoró un tanto hasta que en una deposición en este pleito se le agravó a consecuencia del trato recibido, a juicio del psiquiatra.

14. El TPI incurrió en error manifiesto en la apreciación de la prueba al concluir que la hipertensión le causó a Rafael A. Gómez Pagán un derrame cerebral el 3 de diciembre de 1998. A raíz del proceso evaluativo del 1999, sufrió un segundo infarto cerebral en noviembre de 1999.

15. El TPI incurrió en error manifiesto en la apreciación de la prueba al concluir que Janssen discriminó en contra del co-demandante Rafael A. Gómez Pagán por razón de edad.

16. Erró el TPI al concederle al co-demandante Rafael A. Gómez Pagán daños y perjuicios en la cantidad de $40,000, además de la doble penalidad de ley.

17. Erró el TPI al conceder una partida de lucro cesante por concepto de la incapacidad laboral sin que se hubiese probado que la incapacidad fue producto del alegado discrimen laboral.

18. Erró el TPI al otorgar una partida de lucro cesante por resultar la misma irrazonable en vista de la concesión de la concesión de daños otorgada.

19. Erró el TPI al conceder una partida de lucro cesante ascendente a $232,463.40 sin descontar las cantidades recibidas por el c0-demandante Gómez como beneficios de los planes de incapacidad a corto y largo plazo de Janssen, así como los beneficios recibidos por la Administración del Seguro Social.

## III

Comenzaremos considerando los errores que se circunscriben a la apreciación de la prueba. Como regla general y ante la ausencia de otras herramientas para evaluar si el TPI erró en su apreciación de la prueba, tenemos que ampararnos en la doctrina ampliamente establecida sobre la deferencia judicial en la etapa apelativa a la apreciación de la prueba oral que hizo el juzgador de instancia. La norma jurídica reconocida en nuestro sistema de derecho procesal establece que la apreciación de la prueba realizada por el tribunal sentenciador y la credibilidad que dicho foro otorgue a la prueba, debe ser objeto de gran deferencia por los tribunales apelativos, los cuales, en ausencia de circunstancias extraordinarias o que demuestren que el tribunal apelado actuó movido por la pasión, el prejuicio, la parcialidad, o error manifiesto, no deben intervenir con las determinaciones de hechos de este último. *Municipio de Ponce v. Autoridad de Carreteras y Transportación,* Op. de 29 de diciembre de 2000, **2001 J.T.S. 3,** a la pág. 658; *Trinidad García v. Chade,* Op. de 18 de enero de 2001, **2001 J.T.S. 10,** a la pág. 793; *Colón González v. K-Mart,* Op. de 26 de junio de 2001, **2001 J.T.S. 98,** a la pág. 1484; *Monllor Arzola v. Soc. Legal de Gananciales,* 138 D.P.R. 600 (1995); *Pérez Cruz v. Hosp. La Concepción,* 115 D.P.R. 721 (1984).

Más aún, dispone la Regla 43.2 de las de Procedimiento Civil de Puerto Rico, 32 L.P.R.A., Ap. III, R. 43.2, en lo pertinente, que *"[l]as determinaciones de hechos basadas en testimonio oral no se dejarán sin efecto a menos que sean claramente erróneas, y se dará la debida consideración a la oportunidad que tuvo el Tribunal Sentenciador para juzgar la credibilidad de los testigos".*

A la luz de la normativa esbozada y de las circunstancias del caso, tenemos que concluir que, en ausencia de error manifiesto, pasión, prejuicio o parcialidad al apreciar la prueba, es menester no intervenir con las determinaciones de hechos, la apreciación de la prueba y la adjudicación de credibilidad efectuada por el juzgador del testimonio de las partes y demás testigos.

Ahora bien, esta norma de deferencia judicial no es aplicable a la evaluación de prueba documental o pericial debido a que, en estos casos, los tribunales apelativos están en las mismas condiciones que el tribunal de instancia. Por tal razón, los tribunales apelativos pueden adoptar su propio criterio en cuanto al valor probatorio de ese tipo de evidencia. *Dye-Tex P.R., Inc. v. Royal Ins. Co., P.R.,* 150 D.P.R. 658, 662 (2000); *Culebra Enterprises Corp. v. E.L.A.,* 143 D.P.R. 935 (1997).

Es norma reiterada que la apreciación de la prueba efectuada por los tribunales sentenciadores gozará de gran respeto y deferencia. Fundamento de ello es el hecho de que dichos foros son quienes tienen la oportunidad de ver y observar a los testigos mientras deponen, sus gestos, dudas y contradicciones. Al apreciar la prueba ante su consideración, los tribunales apelativos no habrán de pasar juicio sobre la credibilidad de los testimonios ofrecidos ante el foro de instancia y sustituirlo por el criterio propio. Ello es así, porque el tribunal de instancia es el foro ante el cual declararon los testigos y el cual tuvo la oportunidad de apreciar el comportamiento, evaluar la veracidad del testimonio y dirimir cualquier conflicto que surgiera en el proceso. *Pueblo v. Dávila Delgado,* 143 D.P.R. 157 (1997); *Pueblo v. Chévere Heredia,* 139 D.P.R. 1 (1995); *Pueblo v. Rodríguez Román,* 128 D.P.R. 121 (1991.

En consecuencia, es un principio cardinal que los foros apelativos no intervendrán con las determinaciones efectuadas por los magistrados de instancia a menos que en las mismas exista error manifiesto o que éstos hayan

actuado movidos por prejuicio, parcialidad o pasión. *Monllor v. Soc. de Gananciales,* 138 D.P.R. 600 (1995); *Pueblo v. Lorio Ormsby I,* 137 D.P.R. 722 (1994).

Claro está, la norma antes expuesta no implica que los juzgadores de instancia sean inmunes a cometer errores ni que tales determinaciones sean inmutables. El arbitrio del juzgador, aunque respetable y merecedor de deferencia, no es absoluto. La apreciación errónea de la prueba no tiene credenciales de inmunidad frente a la función revisora de un tribunal apelativo. En dicha función revisora, el tribunal apelativo, por vía de excepción, puede descartar las determinaciones de hechos del Tribunal de Primera Instancia cuando éstas no representan el balance más racional, justiciero y jurídico de la totalidad de la prueba que desfiló ante dicho tribunal. Véanse, *Méndez v. Morales,* 142 D.P.R. 26, (1996); *Rivera Pérez v. Cruz Corchado,* 119 D.P.R. 8, 14 (1987); *Ramos Acosta v. Caparra Dairy, Inc.,* 113 D.P.R. 357, 365 (1982).

Janssen alega que erró el TPI al determinar que a partir de diciembre de 1989, las evaluaciones a Rafael A. Gómez revelan que no necesitaba mucha supervisión, es cooperador con sus compañeros; que Gómez se interesaba por ayudar y aprender nuevos sistemas; y, que entre 1989 y 1995, sus evaluaciones fueron excelentes.

A continuación hacemos un resumen de las evaluaciones incluidas como exhibits en los autos originales. Las primeras evaluaciones fluctuaban de una puntuación de cero (0) a cien (100):

*"1. En la evaluación de abril a diciembre de 1989, obtuvo una puntuación de 82 que equivale a una calificación de sobre promedio; Gómez Pagán firmó la evaluación.*

*2. En la evaluación de enero a diciembre de 1990, obtuvo una puntuación de 88 que equivale a una calificación de sobre promedio; Gómez Pagán firmó la evaluación.*

*3. En la evaluación de enero a diciembre de 1991, obtuvo una puntuación de 90 que equivale a una calificación de excelente; Gómez Pagán firmó la evaluación.*

*4. En la evaluación de enero a diciembre de 1992, obtuvo una puntuación de 94 que equivale a una calificación de excelente; Gómez Pagán firmó la evaluación.*

*5. En la evaluación de enero a diciembre de 1993, obtuvo una puntuación de 96 que equivale a una calificación de excelente; Gómez Pagán firmó la evaluación."*

Luego de un cambio en el formato de las evaluaciones, los parámetros fueron unos diferentes y las puntuaciones fluctuaban de cero (0) a diez (10); Gómez Pagán obtuvo las siguientes evaluaciones:

*"1. En la evaluación de noviembre de 1995, obtuvo una puntuación de 4.4 que equivale a una calificación de que cumple con las expectativas y culmina con una nota que indica que "[d]ebe actuar con más seguridad y tener más confianza en sí mismo. Debe tomar riesgos luego de haber hecho un análisis adecuado del problema o situación". Gómez Pagán firmó esta evaluación.*

*2. En la evaluación de noviembre de 1996, obtuvo una puntuación de 2.72 que equivale a una calificación de que no cumple con las expectativas. Tiene una nota firmada por su supervisor, el Sr. González, que indica que: "Rafael necesita manejar adecuadamente el cambio. Se muestra hostil & resistente al cambio. Necesita mejorar sus técnicas de trabajo en equipo. Crea conflictos con sus compañeros mecánicos y operadores. Se desarrolló Plan de Desarrollo en el que debe trabajar inmediatamente". Gómez Pagán firmó esta evaluación."*

El 2 de enero de 1997, se estableció un plan de desarrollo para Gómez Pagán. Luego de reestructurar nuevamente el sistema de evaluaciones, las puntuaciones fluctuaban de uno (1) a cinco (5). Gómez Pagán obtuvo

las siguientes evaluaciones:

1. En la evaluación de enero a junio de 1997, obtuvo una puntuación de 3.25 que equivale a una calificación de competente. Contiene notas que indican que reaccionó de forma positiva al período probatorio, demostró gran mejoría y es un recurso importante para el departamento. Gómez Pagán firmó esta evaluación.

2. En la evaluación de enero a diciembre de 1997, obtuvo una puntuación de 3.45 que equivale a una calificación de que cumple con las expectativas. El Sr. González manifiesta que *"Rafael sigue desarrollándose en diferentes áreas. Adicional al equipo que ya conoce, aprendió CP-5 (quicksolv) y la nueva línea de Harro Hofliger. Necesita asumir más liderato dentro de la línea de Harro. Ayuda a otros mecánicos cuando lo necesitan"*.

3. En la evaluación de enero a junio de 1998, obtuvo una puntuación de 2.8 que equivale a una calificación de competente. Gómez Pagán incluyó una nota donde indica *"[n]o estoy de acuerdo con esta evaluación, ya que entiendo no se hizo objetivamente. Para mi entender, hay una persecución personal y desearía reunirme a dialogar sobre la misma ante otros foros que puedan ser más razonables y justos. Esta es la segunda ocasión que a mí se me evalúa discriminatoriamente. Espero respuesta y cooperación al respecto. 09-04-98"*. A su vez, el Sr. González añade una nota que dice: *"[n]ecesita hacer mejor uso de su tiempo. Necesita ser más proactivo en resolver los problemas de su línea asignada"*.

4. En la evaluación de julio a diciembre de 1998, obtuvo una puntuación de 2.45 que equivale a una calificación de necesitar mejoramiento. El Sr. González indica que *"[n]ecesita mejorar en sus funciones primarias como mecánico, necesita mejorar en resolver problemas en las máquinas y trabajo en equipo con sus compañeros"*.

El gerente, Pérez Molina, señala *"[a] Rafael A. Gómez se le han dado oportunidades de proveer apoyo a varias líneas de Blisters en CP-5 HUD y Quicksolv además de la Uhlmann. Últimamente ha confrontado dificultad en lograr la óptima eficiencia de estos para cumplir con nuestro itinerario de trabajo; necesita enfocarse un poco más y utilizar sus conocimientos y destrezas más efectivamente, incluyendo la comunicación"*.

5. En la evaluación de enero a junio de 1999, obtuvo una puntuación de 2.5 que equivale a una calificación de por debajo de las expectativas. Gómez Pagán se negó a firmar esta evaluación y manifestó: *"[n]o estoy de acuerdo con esta evaluación y entiendo nuevamente que se está discriminando con mi persona y a la misma vez hay hostigamiento y persecución. Espero se tome en consideración mi comentario y nos podamos reunir en otro foro. 07-22-99"*.

El Sr. González expone que *"[n]ecesita mejorar en la iniciativa. Cuando no hay trabajo en su línea, debe buscar otras áreas donde aprender y mejorar."* Además, en papel aparte señala que: *"[d]urante la discusión de la evaluación, Rafael se mostró molesto y hostil en trabajar en las áreas donde necesita mejoramiento. Al momento de retirarse, se negó a firmar su evaluación y se levantó y abandonó la oficina. Inmediatamente retornó y me dijo "Recuerda que las vueltas del mundo son grandes, y se retiró"*.

6. En la evaluación de julio a diciembre de 1999, obtuvo una puntuación de 1.68 que equivale a una calificación de por debajo de las expectativas. El Sr. González indica que *"Rafael necesita mejorar en la resolución de problemas más rápido. Necesita desarrollarse en los aspectos técnicos del área. Necesita cambiar su forma de trabajar a una más proactiva y menos defensiva. Durante el período de discusión de la evaluación, Rafael se encuentra en STD (Plan de Incapacidad de Corta Duración); por está razón no se pudo discutir la evaluación"*.

7. Durante el período de evaluación de enero a junio de 2000, Gómez Pagán se encontraba en LTD (Plan de

Incapacidad de Larga Duración).

El 18 de agosto de 1999, se estableció otro plan de desarrollo para el Sr. Gómez Pagán. Luego de examinar las evaluaciones encontramos que el TPI entendió correctamente las evaluaciones al concluir que las primeras evaluaciones hasta el 1995 eran superiores a las evaluaciones que se realizaron posteriormente.

También se alega que erró el TPI al determinar que la filosofía de Janssen fue expuesta en el tablero de edictos de la planta en un artículo donde se reseñaba que las personas productivas eran las jóvenes, que a mayor edad, menos rendimiento, que el artículo se puso con el fin de que todos lo viesen, y que según la gráfica, las personas con más de cincuenta años de edad no son productivas como empleados. El TPI le dio entera credibilidad a los testimonios de Gómez Pagán y del Sr. Carlos Burgos, al concluir que: 1) el artículo se colocó en el tablón de edictos al que sólo tenía acceso la secretaría del departamento; 2) el contenido del mismo era sobre la productividad de los empleados según la edad; y 3) éste señalaba que a mayor edad, menor la productividad. No intervendremos con esta determinación del TPI.

Por otro lado, comparando los testimonios de los empleados de mayor edad con los más jóvenes simultáneamente a los comentarios de Cándido González a sus supervisados, mayores que él, diciéndoles que eran obsoletos, no estaban al día y eran viejos; y que, contrariamente, a los mecánicos del segundo turno los trataba de manera considerado, aceptaba sus ideas y era amable, tenemos que concluir al igual que concluyó el TPI, que tanto a Gómez Pagán como a Burgos, el Sr. González les hizo comentarios despectivos acerca de su edad. Por el contrario, trataba muy bien a los más jóvenes, entre ellos, Arroyo Ramírez, quien testificó sobre lo bien que lo trataba el Sr. González, aunque era fuerte y exigía mucho.

Además, Janssen alega que se equivocó el TPI al determinar que Cándido González comenzó a favorecer a los mecánicos jóvenes asignándoles seminarios para capacitarlos y mejores evaluaciones, mientras que a los mayores no se les entrenaba en los equipos y las líneas nuevas. Se presentaron como exhibits el listado de seminarios tomados por Gómez Pagán y sus evaluaciones. Además, el mismo Gómez Pagán testificó sobre la diferencia en comparación con los empleados más jóvenes. También Carlos Burgos testificó sobre las evaluaciones que consideró injustas y poco objetivas por razón de su edad. Pero nunca se presentaron evaluaciones o listados de seminarios para alguno de esos empleados más jóvenes, por lo que sólo podemos concluir que el TPI entendió que el testimonio de Gómez Pagán merecía entera credibilidad.

Enumerado como otro error, Janssen alega que desacertó el TPI al determinar simplemente que Faustino Aponte fue descendido eventualmente del puesto de mecánico. Del testimonio del Sr. Aponte se desprende que primero fue descendido y luego ascendido, por lo que obtuvo un aumento salarial. Él indica que Janssen le dio la oportunidad de ascender profesionalmente. En este punto, erró el TPI.

Por otro parte, de la prueba presentada se desprende como correctamente concluyó el TPI que además de realizar tres reuniones para discutir la situación, Janssen no realizó ningún acto afirmativo encaminado a investigar las alegaciones de Gómez Pagán y resolver el problema de discrimen. Esto aun cuando la política de la empresa era una en contra del discrimen.

En el presente recurso, Janssen no aduce razones o hechos que denoten pasión, prejuicio, parcialidad o error manifiesto en la apreciación de la prueba por parte del TPI. Ante tal situación y en ausencia de circunstancias extraordinarias, no intervendremos con la apreciación general efectuada por el TPI.

El TPI celebró cuatro (4) días de vistas en los cuales evaluó abundante prueba documental, testifical y pericial. Tuvo ante sí los testigos, evaluó sus comportamientos al testificar, adjudicó la credibilidad que les merecían y evaluó un sinnúmero de exhibits. En consideración a lo cual, determinó que Janssen discriminó contra Gómez Pagán por razón de su edad. No estamos en posición de concluir de una manera diferente.

Luego de haber determinado que Gómez Pagán fue discriminado por Janssen, entraremos a evaluar los daños ocasionados a éste por el discrimen. Como mencionáramos anteriormente, es norma reiterada que los tribunales tienen amplia discreción en la apreciación de la prueba pericial, pudiendo adoptar su propio criterio en la apreciación o evaluación de la misma y hasta descartarla, aunque resulte técnicamente correcta. *Dye-Tex P.R., Inc.,* 150 D.P.R. a la pág. 662; *Prieto v. Maryland Casualty Co.,* 98 D.P.R. 594, 623 (1970). En lo referente a la evaluación y apreciación de la prueba médica pericial, este Tribunal está en la misma posición que los tribunales de primera instancia. *Rodríguez Cancel v. A.E.E.,* 116 D.P.R. 443, 450 (1985).

El TPI le dio entera credibilidad al testimonio pericial del Dr. Jaime Del Toro y concluyó que: 1) la tensión emocional llevó a la hipertensión, ésta a los infartos cerebrales y las lesiones que dejaron le causaron el mal de *"Parkinson"*; 2) después de dejar el empleo, la condición emocional mejoró un tanto hasta que en una deposición en este pleito se le agravó a consecuencia del trato recibido; y 3) la hipertensión le causó a Rafael A. Gómez Pagán un derrame cerebral el 3 de diciembre de 1998 y a raíz del proceso evaluativo del 1999, sufrió un segundo infarto cerebral en noviembre de 1999.

En el *Informe de Evaluación Psiquiátrica* presentado por el Dr. Jaime Del Toro, se resume el historial médico de Gómez Pagán de la siguiente manera:

*"El señor Rafael Gómez padece de hipertensión arterial, al presente refractaria, padece de hernia hiatal, padece de válvula tricúspide y esclerosis aórtica con válvula mitral atrofiada. Ha tenido dos derrames cerebrales uno en diciembre 3 del 1998 y otro en noviembre del 1999, padece de síndrome Pakinsoniano [sic] desde diciembre del 1999, tiene un padecimiento de espasmos musculares cervicales y radiculopatía C3-C4 y radiculopatía L3-L4, con una lesión periférica y central lumbosacral con lesiones en vías ascendentes somatosensoriales. No padece de alergias o enfermedades crónicas infecciosas. No hay historial de abuso de substancias, no hay historial de alcoholismo o drogadicción, no hay historial de problemas con las tiroides, ni diabetes mellitus."*

El Dr. Del Toro diagnosticó a Gómez Pagán con una Depresión Mayor Recurrente con Ansiedad Severa. El diagnóstico psiquiátrico surge de la evaluación directa de Gómez Pagán, por lo que no hay duda de que el discrimen fue el factor determinante en la condición de depresión. Por otro lado, las conclusiones sobre la relación causal de las demás condiciones con el discrimen no es tan clara. Al comparar el testimonio del Dr. Del Toro con su informe pericial, surgen ciertas dudas; por ejemplo las referencias a dos derrames cerebrales cuando realmente fueron dos ataques isquémicos cerebrales transitorios leves. De su testimonio se desprende que prácticamente todas las conclusiones referentes a las condiciones no psiquiátricas estaban basadas en la información provista por el mismo Gómez Pagán. Además, indicó que la condición de hipertensión comenzó aproximadamente para el año 1989, cinco (5) años antes de que comenzara el discrimen. No se probó una cadena real entre el discrimen y las condiciones cardio y neurológicas de Gómez Pagán. Por lo tanto, no podemos concluir, según la prueba vertida, que la incapacidad total para trabajar de Gómez Pagán fue ocasionada por el discrimen debido a su edad.

Por otro lado, analizamos si la cantidad de cuarenta mil dólares ($40,000) concedida por daños y perjuicios a Gómez Pagán es irrazonable. La estimación de los daños es una función que descansa en la sana discreción del juzgador. *Toro Mercado v. P.R. & Amer. Ins. Co.,* 87 D.P.R. 658, 659 (1963). De ordinario, un tribunal apelativo respetará la valoración de los daños que haga un tribunal de primera instancia, por dicho foro estar en mejor posición para evaluar sus elementos visibles e intangibles. De ahí, la norma de que un tribunal apelativo sólo intervendrá con las cuantías concedidas en casos en que sean exageradamente altas o ridículamente bajas. *Quiñones López v. Manzano Pozas,* 141 D.P.R. 139 (1996); *Torres Solís v. A.E.E.,* 136 D.P.R. 302, 312 (1994). Por otro lado, nuestro Tribunal Supremo ha destacado el sentido remediador y no punitivo que encarna el Art. 1802 del Código Civil, 31 L.P.R.A. § 5141. *Vda. de Valentín v. E.L.A.,* 84 D.P.R. 112, 123 (1961).

La gestión judicial de estimación y valoración de daños es particularmente difícil; no existe un sistema mecánico que permita llegar a un resultado exacto en relación con el cual se pueda asegurar que todas las partes queden satisfechas y complacidas. De ordinario, los tribunales de primera instancia están en una mejor posición que los tribunales apelativos para evaluar la cuantía de los daños, ya que éstos son los que tienen contacto directo con la prueba que presenta la parte que los reclama. Por esta razón, existe una norma de abstención judicial que dispone que no debe intervenirse con las determinaciones de daños hechas por los tribunales de primera instancia a menos que las cuantías concedidas sean *"ridículamente bajas o exageradamente altas"*. *Vélez Rodríguez v. Amaro Cora*, 138 D.P.R. 182 (1995); *Rodríguez Cancel v. A.E.E.*, 116 D.P.R. 443, 451 (1985); *Urrutia v. A.A.A.*, 103 D.P.R. 643 (1975); *Valdejuli Rodríguez v. A.A.A.*, 99 D.P.R. 917 (1971).

La parte que solicita la modificación de las sumas concedidas por un tribunal de primera instancia en concepto de daños, tiene que demostrarle al tribunal apelativo la existencia de circunstancias especiales que así lo requieren. *Canales Velázquez v. Rosario Quiles*, 107 D.P.R. 757 (1978).

Luego de examinar la prueba pericial en el caso de autos, consistente del informe pericial y del testimonio del perito, Dr. Del Toro Soto, así como el testimonio de los testigos, consideramos que la cuantía debe ser modificada. Gómez Pagán padece de depresión debido al discrimen al que fue sujeto por un período de alrededor de cuatro (4) años; que, entre otras cosas, incluyó bajas evaluaciones de trabajo y comentarios despectivos con respecto a su edad. Por esta razón, aumentamos la cuantía concedida a sesenta mil dólares ($60,000).

Janssen también ataca la partida concedida por lucro cesante tanto en su concesión como en la cuantía. Para dilucidar este planteamiento, debemos guiarnos por la doctrina establecida por nuestro Tribunal Supremo respecto a la compensación por lucro cesante al amparo de la Ley Núm. 100 de 30 de junio de 1959, 29 L.P.R. A. § 146-151; Artículo 18 del Código Civil de Puerto Rico, 31 L.P.R.A. §18. La compensación que se concede al amparo de la Ley Núm. 100 incluye, entre otras, la pérdida económica según los ingresos y beneficios que un demandante deja de percibir desde la fecha del despido hasta la fecha de la sentencia. El lucro cesante se ha calificado como *"ingresos dejados de percibir"*. En ese sentido, una reclamación referente a ingresos dejados de percibir está incluida en el lucro cesante. Esa compensación por ingresos dejados de percibir tiene el mismo carácter de ganancialidad que se le atribuye al lucro cesante. Siendo los salarios un elemento esencial de la relación obrero-patronal, se ha establecido que el lucro cesante está claramente incluido entre los daños compensables bajo la Ley Núm. 100. *Maldonado v. Banco Central Corp.*, 138 D.P.R. 268, 272-273 (1995).

Al instar una acción bajo la Ley Núm. 100, un empleado casado implícitamente reclama en representación de su sociedad de gananciales las partidas que le correspondan a ésta. La imposición doble de dicha compensación que establece la ley, no desnaturaliza el carácter ganancial del lucro cesante. *Maldonado*, 138 D. P.R. a las págs. 273-274. La referida compensación se concede desde la fecha del despido hasta la fecha de la sentencia. *Maldonado*, 138 D.P.R. a la pág. 272.

Habiéndose determinado que Gómez Pagán fue objeto de un despido constructivo por el discrimen, el TPI tiene que calcular la compensación por pérdida económica según los ingresos y beneficios desde el último día que éste trabajó hasta la fecha en que se dictó la sentencia. No se encontró nexo causal entre el discrimen y la condición de *"Parkinson"*, por lo que se revoca la compensación por lucro cesante hasta la fecha de su retiro de no padecer la condición. La compensación se calculará desde el último día que trabajó hasta el día que se dictó la Sentencia.

Debemos también examinar la doctrina denominada *"fuente colateral"* que, según Gómez Pagán, es aplicable al caso de autos. En nuestra jurisdicción está vigente la doctrina de la fuente colateral y la misma, como regla general, impide al causante de un daño, deducir del importe de la indemnización de la cual responde, la compensación o beneficios que haya recibido el perjudicado de una tercera persona o entidad, no relacionada

con el demandando. El demandante tiene derecho a todos los gastos específicos que correspondan aunque: (1) los servicios le hayan sido rendidos gratuitamente; o (2) los gastos le hayan sido pagados por otros; o (3) como una liberalidad, su patrono u otra persona le haya pagado sus salarios; o (4) estos gastos están cubiertos por pólizas de seguros, siempre que no se trate de un seguro de cosas, pues en ésta no se admite generalmente la acumulación de beneficios. *Futurama Import Corp v. Trans Caribbean*, 104 D.P.R. 609, 611-612 (1976); Carlos J. Irizarry Yunqué, *Responsabilidad Civil Extracontractual: Un Estudio Basado en las Decisiones del Tribunal Supremo de Puerto Rico* 475 (Facultad de Derecho de la Universidad Interamericana de Puerto Rico, San Juan 1995).

Sin embargo, el valor o interés social de una norma jurídica sobre daños, está subordinada al principio rector de hacer justicia independientemente de su origen. La utilidad de la doctrina que nos ocupa, no puede circunscribirse en términos exclusivos de castigar al causante del daño o de premiar al perjudicado y tampoco puede basarse en una premisa de costo. *Futurama Import Corp.*, 104 D.P.R. a las págs. 612-613.

Ante la alternativa de aplicar mecánicamente la doctrina o rechazarla en su totalidad, lo más razonable es identificar en cada caso sus circunstancias peculiares, y de acuerdo a la naturaleza del daño sufrido y del examen del origen y propósito o razón de ser del beneficio colateral de que se trate, determinar la improcedencia o la justificación de la acumulación de compensaciones. Esta posición toma en cuenta las diversas clases de fuentes de beneficios colaterales y las diferencias entre las mismas. Es incorrecto analizar el ámbito o frontera de la regla en el contexto de lograr una regla sencilla aplicable. A los fines de decidir la aplicabilidad o no de la doctrina en el campo de seguro, es necesario establecer una distinción entre seguro de cosas y los seguros sobre la vida o contra accidentes susceptibles de ocurrirle a las personas. *Futurama Import Corp.*, 104 D.P.R. a la pág. 614; *Canales v. Pan American*, 112 D.P.R. 329, 343 (1982).

En *Futurama Import Corp.*, 104 D.P.R. a las págs. 611-612, nuestro Tribunal Supremo expuso de la siguiente manera la doctrina de la fuente colateral:

*"Reiteramos la vigencia en nuestra jurisdicción de dicha doctrina, que como regla general impide al causante de un daño deducir del importe de la indemnización de la cual responde, la compensación o beneficios que haya recibido el perjudicado de una tercera persona o entidad, esto es, de una fuente no relacionada con el demandado, denominada "collateral source rule". Constituye la norma que aplicáramos en los casos de Goose v. Hilton Hotels, 79 D.P.R. 523 (1956); Pereira v. Commercial Transport Co., 70 D.P.R. 641 (1949), y Reyes v. Aponte, 60 D.P.R. 890 (1942), en que sostuvimos el derecho de una parte a reclamar unos salarios por lucro cesante, no empece habérselos pagado su patrono, por estimar que se trataban de unas donaciones que no podían beneficiar al demandado. El pago de salarios durante vacaciones o enfermedad del empleado se reconoce por razones distintas a las que dan lugar a una compensación por negligencia. Los salarios se originan en un contrato de trabajo, y en caso de ausencia por accidente hasta podrían tener carácter de bonificación o donación a un buen empleado para beneficio de su familia que depende de ese ingreso; no es una compensación propiamente dicha. Un análisis de la abundante literatura sobre esta doctrina, demuestra que la misma descansa sobre fundamentos racionales y lógicos, que si bien a veces resultan complejos, no necesariamente anulan su eficacia y la variedad de beneficios en que es susceptible de ser correctamente aplicada."*

Como dijéramos anteriormente, dicha doctrina establece, como regla general, que *"el causante de un daño está impedido de deducir del importe de la indemnización que se le ha impuesto, la compensación o beneficios que el perjudicado haya recibido de una tercera persona o entidad"*. *Nieves Cruz v. U.P.R.*, Op. de 31 de mayo de 2000, **2000 J.T.S. 91** a la pág. 1209. Esta norma está fundamentada en el principio de que el causante de un daño no debe beneficiarse de lo que el perjudicado haya recibido por la liberalidad de otros, ni de los servicios públicos extendidos por la comunidad a los necesitados. Sin embargo, la misma no ha de aplicarse mecánicamente. En este sentido, y conscientes del problema de la doble compensación, en *Futurama Import Corp.*, 104 D.P.R. a la pág. 614, nuestro Tribunal Supremo señaló que en cada caso deberá examinarse el origen

y propósito del beneficio colateral en cuestión, para decidir si éste se deduce, o no, de la indemnización. En cuanto a este problema que la doctrina de la fuente colateral arrastra consigo, el problema jurídico que implica que un agraviado reciba una doble compensación por los daños sufridos, en *Futurama Import Corp.*, 104 D.P.R. a la pág. 613:

*"Cuando la víctima es indemnizada, el perjuicio ha desaparecido. Por ello, no cabría demandar de nuevo reparación. El principio es simple. Pero su aplicación origina numerosas dificultades. Se refieren a que es delicado en ocasiones saber si ha sido total la indemnización de la víctima; cuando no la haya sido, la víctima puede demandar el complemento. Se refieren también a que, en algunos casos, el accidente permite a la víctima recibir de un tercero una suma de dinero; ¿se encuentra todavía la víctima con derecho para reclamar una indemnización al autor del daño?*

*[...]*

*La segunda constituye lo que puede llamarse el problema de la acumulación de las indemnizaciones. La víctima no puede acumular varias indemnizaciones por el mismo perjuicio. Así, cuando el daño le haya sido causado por varias personas, aquélla tiene derecho a reclamar reparación de la totalidad a uno sólo de los coautores; pero, si obtiene satisfacción, no puede reclamar ya nada a los restantes coautores [...] . La cuestión es más difícil de resolver cuando cabe dudar acerca de la naturaleza de la suma que la víctima ha recibido de un tercero: ¿es una indemnización?; en ese caso, su acción se ha extinguido, ya que está reparado el daño sufrido; ¿se trata de una suma abonada por otro título?; entonces, la víctima conserva su acción contra el autor del daño."* (Énfasis en el original).

Igual visión sobre la concurrencia de compensación de daños, previamente pagados por una aseguradora y vuelto a reclamar frente a otra, fue expresada en *Canales v. Pan American*, 112 D.P.R. 329 (1982). En resumen, la doctrina de fuente colateral no debe ser invocada automáticamente por los tribunales, sino que debe mediar en su aplicación un análisis ponderado de las circunstancias específicas del caso en cuestión. Esto es particularmente cierto en aquellos casos en que el demandante reclame compensación por pérdida respecto a los cuales ya hubiere recibido resarcimiento de otra cubierta de póliza de seguro. Como se sabe, un daño especial es aquel desembolso o pérdida que en forma específica reduce el patrimonio personal del reclamante, por ejemplo, gastos médicos.

Por lo anterior, el dinero recibido por Gómez Pagán por los planes de incapacidad cubiertos directamente por el patrono son deducibles de la cantidad a recibir en concepto de pérdida económica según los ingresos y beneficios. No así las demás cantidades recibidas; por ejemplo, el seguro social.

Por último, examinamos si erró el TPI al conceder una partida excesiva de costas por concepto de peritaje. El 29 de julio de 2002, Gómez Pagán presentó un *Memorando de Costas Regla 44 de las de Procedimiento Civil* donde desglosó las costas de la siguiente manera:

**Memorando De Costas**

Sellos de Radicación ........................................... $41.00

Presentación y Emplazamiento .......................... $115.00

Fotocopias Totalidad del Proceso ................... $1,250.00

Sellos de Rentas Internas .................................... $26.00

Peritaje (Dr. Jaime Del Toro) ........................... $8,850.00

Gastos de Correspondencia ................................. $34.00

La Regla 44.1(a) de las de Procedimiento Civil, 32 L.P.R.A. Ap. III, regula la imposición de costas. Esta tiene una función reparadora y su propósito es resarcir a la parte victoriosa los gastos necesarios y razonables incurridos durante el litigio. La imposición de costas a la parte vencida es mandatoria. *Auto Servi, Inc. v. E.L.A.,* 142 D.P.R. 321, 326 (1997); *Rodríguez Cancel v. A.E.E.,* 116 D.P.R. 443, 461 (1985); *Ferrer Delgado v. Tribunal Superior*, 101 D.P.R. 516, 517 (1973). El TPI determinará quién fue el litigante vencedor y cuáles gastos fueron necesarios y razonables.

Por lo tanto, la concesión de las costas en una acción civil ordinaria, la imposición de costas a la parte perdidosa es mandatoria, una vez se reclaman oportuna y adecuadamente las mismas mediante memorando. *Auto Servi, Inc. v. E.L.A.,* 142 D.P.R. 321 (1997); *Santos Bermúdez v. Texaco,* 123 D.P.R. 351, 355 (1989); *Pereira v. I.B.E.C.,* 95 D.P.R. 28, 68 (1967).

Iniciamos el análisis de la petición recordando que la jurisprudencia ha interpretado que las costas *"son gastos (a) necesarios, (b) incurridos y (c) razonables [...] No se aprobarán gastos innecesarios, superfluos o extravagantes"*. *Garriga, Jr. v. Tribunal Superior*, 88 D.P.R. 245, 257 (1963).

El pago de honorarios de peritos como gasto no es automático. Al pasar juicio sobre si procede o no el pago de dichos honorarios, el tribunal tiene que evaluar su naturaleza y utilidad a la luz de los hechos particulares del caso ante su consideración, teniendo la parte que los reclama el deber de demostrar que el testimonio pericial presentado era necesario para que prevaleciera su teoría. *Rodríguez Cancel v. A.E.E.,* 116 D.P.R. 443, 461 (1985). Depende de si se trata de un perito del tribunal o de la parte y, con respecto a este último, la regla general es que son recobrables, a discreción del tribunal, sólo por vía de excepción y cuando las expensas que origine el pleito estén plenamente justificadas. *Andino Nieves v. A.A.A.,* 123 D.P.R. 712, 716 (1989). Ahora bien, para que sean recobrables los honorarios de un perito, el testimonio de éste tiene que ser necesario para sostener la reclamación y para que la parte que reclama su recobro, prevaleciera. *Arrieta Barbosa v. Chinea*, 139 D.P.R. 525, 542 (1995).

A la luz de la normativa antes expuesta, examinemos la situación que nos presenta el recurso ante nuestra consideración.

Según se desprende de la sentencia dictada por el TPI, el testimonio del Dr. Jaime Del Toro fue una pieza fundamental para la determinación tomada. Así las cosas, es forzoso concluir que la prueba pericial ofrecida por el Dr. Jaime Del Toro fue utilizada y por tanto fue indispensable o esencial para que Gómez Pagán prevaleciera en el caso.

En el pleito que evaluamos, no puede existir duda alguna en cuanto a que la extensión y naturaleza de los daños sufridos por Gómez Pagán estuvieron en controversia en el pleito ante el TPI. En tales circunstancias y según apreciamos de los autos ante nosotros, el Dr. Del Toro Soto es un perito intermedio contratado por Gómez Pagán como su perito para el pleito. Este no sólo evaluó y diagnosticó su condición psiquiátrica, sino que compareció a la vista en su fondo del caso, testificó sobre todos sus hallazgos y concluyó que la depresión de Gómez Pagán estaba vinculada directamente con el discrimen del cual fue víctima. El TPI entendió que el testimonio del perito fue necesario para demostrar los daños y angustias mentales y la cuantía de honorarios era razonable. Determinamos, pues, que actuó correctamente el TPI al conceder los honorarios del perito como costas y que éstas no fueron excesivas, por lo cual no intervendremos con su determinación.

En mérito a lo expuesto, denegamos el auto de *certiorari* solicitado por Janssen (KLCE-2002-00952) y determinamos que procedía la imposición de costas y las concedidas no fueron excesivas. Por otro lado, confirmamos la determinación de discrimen por razón de edad que hiciera el TPI y modificamos la cuantía de

daños. Por ultimo, modificamos la compensación por pérdida de ingresos que hiciera el TPI y devolvemos el caso al Tribunal de Primera Instancia para que calcule dicha pérdida de forma compatible con lo resuelto.

Lo acordó el Tribunal y lo certifica la Secretaria General.

Aida I. Oquendo Graulau
Secretaria General

**ESCOLIO 2004 DTA 109**

**1.** Mediante **Sentencia Parcial** de 24 de abril de 2002, archivada en los autos copia de su notificación el 2 de julio de 2002, el TPI decretó el archivo en cuanto a la reclamación contra Cándido González Martínez a virtud de las disposiciones de la Regla 39.1 de las de Procedimiento Civil.